DEAN MILK CO. *v.* CITY OF MADISON ET AL.

No. 258.   Argued December 7, 1950.—Decided January 15, 1951.

George S. Geffs and Jacob Geffs argued the cause and filed a brief for appellant. J. Arthur Moran was also of counsel.

Walter P. Ela and Harold E. Hanson argued the cause and filed a brief for appellees.

MR. JUSTICE CLARK delivered the opinion of the Court.

This appeal challenges the constitutional validity of two sections of an ordinance of the City of Madison, Wisconsin, regulating the sale of milk and milk products within the municipality's jurisdiction. One section in issue makes it unlawful to sell any milk as pasteurized unless it has been processed and bottled at an approved pasteurization plant within a radius of five miles from the central square of Madison.[1] Another section, which prohibits the sale of milk, or the importation, receipt or storage of milk for sale, in Madison unless from a source of supply possessing a permit issued after inspection by Madison officials, is attacked insofar as it expressly relieves municipal authorities from any duty to inspect farms

---

[1] General Ordinances of the City of Madison, 1949, § 7.21 provides as follows:

"It shall be unlawful for any person, association or corporation to sell, offer for sale or have in his or its possession with intent to sell or deliver in the City of Madison, any milk, cream or milk products as pasteurized unless the same shall have been pasteurized and bottled in the manner herein provided within a radius of five miles from the central portion of the City of Madison otherwise known as the Capitol Square, at a plant housing the machinery, equipment and facilities, all of which shall have been approved by the Department of Public Health."

located beyond twenty-five miles from the center of the city.[2]

Appellant is an Illinois corporation engaged in distributing milk and milk products in Illinois and Wisconsin. It contended below, as it does here, that both the five-mile limit on pasteurization plants and the twenty-five-mile limit on sources of milk violate the Commerce Clause and the Fourteenth Amendment to the Federal Constitution. The Supreme Court of Wisconsin upheld the five-mile limit on pasteurization.[3] As to the twenty-five-mile limitation the court ordered the complaint dismissed for want of a justiciable controversy. 257 Wis. 308, 43 N. W. 2d 480 (1950). This appeal, contesting both rulings, invokes the jurisdiction of this Court under 28 U. S. C. § 1257 (2).

The City of Madison is the county seat of Dane County. Within the county are some 5,600 dairy farms with total

[2] *Id.*, § 7.11, provides in pertinent part as follows:

"It shall be unlawful for any person to bring into or receive into the City of Madison, Wisconsin, or its police jurisdiction, for sale, or to sell, or offer for sale therein, or to have in storage where milk or milk products are sold or served, any milk or milk product as defined in this ordinance from a source not possessing a permit from the Health Commissioner of the City of Madison, Wisconsin.

"Only a person who complies with the requirements of this ordinance shall be entitled to receive and retain such a permit.

"On the filing of an application for a permit with the Health Commissioner, he shall cause the source of supply named therein to be inspected and shall cause all other necessary inspections and investigations to be made. The Department of Public Health shall not be obligated to inspect and issue permits to farms located beyond twenty-five (25) miles from the central portion of the City of Madison otherwise known as the Capitol Square. . . ."

[3] In upholding § 7.21, note 1, *supra*, the court relied upon the principles announced by it in *Dyer* v. *City Council of Beloit*, 250 Wis. 613, 27 N. W. 2d 733 (1947), judgment vacated, 333 U. S. 825 (1948).

raw milk production in excess of 600,000,000 pounds annually and more than ten times the requirements of Madison. Aside from the milk supplied to Madison, fluid milk produced in the county moves in large quantities to Chicago and more distant consuming areas, and the remainder is used in making cheese, butter and other products. At the time of trial the Madison milkshed was not of "Grade A" quality by the standards recommended by the United States Public Health Service, and no milk labeled "Grade A" was distributed in Madison.

The area defined by the ordinance with respect to milk sources encompasses practically all of Dane County and includes some 500 farms which supply milk for Madison. Within the five-mile area for pasteurization are plants of five processors, only three of which are engaged in the general wholesale and retail trade in Madison. Inspection of these farms and plants is scheduled once every thirty days and is performed by two municipal inspectors, one of whom is full-time. The courts below found that the ordinance in question promotes convenient, economical and efficient plant inspection.

Appellant purchases and gathers milk from approximately 950 farms in northern Illinois and southern Wisconsin, none being within twenty-five miles of Madison. Its pasteurization plants are located at Chemung and Huntley, Illinois, about 65 and 85 miles respectively from Madison. Appellant was denied a license to sell its products within Madison solely because its pasteurization plants were more than five miles away.

It is conceded that the milk which appellant seeks to sell in Madison is supplied from farms and processed in plants licensed and inspected by public health authorities of Chicago, and is labeled "Grade A" under the Chicago ordinance which adopts the rating standards recommended by the United States Public Health Serv-

ice. Both the Chicago and Madison ordinances, though not the sections of the latter here in issue, are largely patterned after the Model Milk Ordinance of the Public Health Service. However, Madison contends and we assume that in some particulars its ordinance is more rigorous than that of Chicago.

Upon these facts we find it necessary to determine only the issue raised under the Commerce Clause, for we agree with appellant that the ordinance imposes an undue burden on interstate commerce.

This is not an instance in which an enactment falls because of federal legislation which, as a proper exercise of paramount national power over commerce, excludes measures which might otherwise be within the police power of the states. See *Currin* v. *Wallace,* 306 U. S. 1, 12–13 (1939). There is no pertinent national regulation by the Congress, and statutes enacted for the District of Columbia indicate that Congress has recognized the appropriateness of local regulation of the sale of fluid milk. D. C. Code, 1940, §§ 33–301 *et seq.* It is not contended, however, that Congress has authorized the regulation before us.

Nor can there be objection to the avowed purpose of this enactment. We assume that difficulties in sanitary regulation of milk and milk products originating in remote areas may present a situation in which "upon a consideration of all the relevant facts and circumstances it appears that the matter is one which may appropriately be regulated in the interest of the safety, health and well-being of local communities . . . ." *Parker* v. *Brown,* 317 U. S. 341, 362–363 (1943); see *H. P. Hood & Sons* v. *Du Mond,* 336 U. S. 525, 531–532 (1949). We also assume that since Congress has not spoken to the contrary, the subject matter of the ordinance lies within the sphere of state regulation even though interstate com-

merce may be affected. *Milk Control Board* v. *Eisenberg Farm Products,* 306 U. S. 346 (1939); see *Baldwin* v. *Seelig, Inc.,* 294 U. S. 511, 524 (1935).

But this regulation, like the provision invalidated in *Baldwin* v. *Seelig, Inc., supra,* in practical effect excludes from distribution in Madison wholesome milk produced and pasteurized in Illinois. "The importer . . . may keep his milk or drink it, but sell it he may not." *Id.,* at 521. In thus erecting an economic barrier protecting a major local industry against competition from without the State, Madison plainly discriminates against interstate commerce.[4] This it cannot do, even in the exercise of its unquestioned power to protect the health and safety of its people, if reasonable nondiscriminatory alternatives, adequate to conserve legitimate local interests, are available. Cf. *Baldwin* v. *Seelig, Inc., supra,* at 524; *Minnesota* v. *Barber,* 136 U. S. 313, 328 (1890). A different view, that the ordinance is valid simply because it professes to be a health measure, would mean that the Commerce Clause of itself imposes no limitations on state action other than those laid down by the Due Process Clause, save for the rare instance where a state artlessly discloses an avowed purpose to discriminate against interstate goods. Cf. *H. P. Hood & Sons* v. *Du Mond, supra.* Our issue then is whether the discrimination inherent in the Madison ordinance can be justified in view of the character of the local interests and the available methods of protecting them. Cf. *Union Brokerage Co.* v. *Jensen,* 322 U. S. 202, 211 (1944).

It appears that reasonable and adequate alternatives are available. If the City of Madison prefers to rely upon its own officials for inspection of distant milk

---

[4] It is immaterial that Wisconsin milk from outside the Madison area is subjected to the same proscription as that moving in interstate commerce. Cf. *Brimmer* v. *Rebman,* 138 U. S. 78, 82–83 (1891).

sources, such inspection is readily open to it without hardship for it could charge the actual and reasonable cost of such inspection to the importing producers and processors. Cf. *Sprout* v. *City of South Bend,* 277 U. S. 163, 169 (1928); see *Miller* v. *Williams,* 12 F. Supp. 236, 242, 244 (D. Md. 1935). Moreover, appellee Health Commissioner of Madison testified that as proponent of the local milk ordinance he had submitted the provisions here in controversy and an alternative proposal based on § 11 of the Model Milk Ordinance recommended by the United States Public Health Service. The model provision imposes no geographical limitation on location of milk sources and processing plants but excludes from the municipality milk not produced and pasteurized conformably to standards as high as those enforced by the receiving city.[5] In implementing such an ordinance, the importing city obtains milk ratings based on uniform standards and established by health authorities in the jurisdiction where production and processing occur. The receiving city may

---

[5] Section 11 of the United States Public Health Service Milk Ordinance as recommended in 1939 provides:

"Milk and milk products from points beyond the limits of routine inspection of the city of ............ may not be sold in the city of ............, or its police jurisdiction, unless produced and/or pasteurized under provisions equivalent to the requirements of this ordinance; provided that the health officer shall satisfy himself that the health officer having jurisdiction over the production and processing is properly enforcing such provisions."

The following comment on this section is contained in the Public Health Service Milk Code:

"It is suggested that the health officer approve milk or milk products from distant points without his inspection if they are produced and processed under regulations equivalent to those of this ordinance, and if the milk or milk products have been awarded by the State control agency a rating of 90 percent or more on the basis of the Public Health Service rating method." Federal Security Agency, Public Health Bulletin No. 220 (1939), 145.

determine the extent of enforcement of sanitary standards in the exporting area by verifying the accuracy of safety ratings of specific plants or of the milkshed in the distant jurisdiction through the United States Public Health Service, which routinely and on request spot checks the local ratings. The Commissioner testified that Madison consumers "would be safeguarded adequately" under either proposal and that he had expressed no preference. The milk sanitarian of the Wisconsin State Board of Health testified that the State Health Department recommends the adoption of a provision based on the Model Ordinance. Both officials agreed that a local health officer would be justified in relying upon the evaluation by the Public Health Service of enforcement conditions in remote producing areas.

To permit Madison to adopt a regulation not essential for the protection of local health interests and placing a discriminatory burden on interstate commerce would invite a multiplication of preferential trade areas destructive of the very purpose of the Commerce Clause. Under the circumstances here presented, the regulation must yield to the principle that "one state in its dealings with another may not place itself in a position of economic isolation." *Baldwin* v. *Seelig, Inc., supra,* at 527.

For these reasons we conclude that the judgment below sustaining the five-mile provision as to pasteurization must be reversed.

The Supreme Court of Wisconsin thought it unnecessary to pass upon the validity of the twenty-five-mile limitation, apparently in part for the reason that this issue was made academic by its decision upholding the five-mile section. In view of our conclusion as to the latter provision, a determination of appellant's contention as to the other section is now necessary. As to this

issue, therefore, we vacate the judgment below and remand for further proceedings not inconsistent with the principles announced in this opinion.

*It is so ordered.*

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MINTON concur, dissenting.

Today's holding invalidates § 7.21 of the Madison, Wisconsin, ordinance on the following reasoning: (1) the section excludes wholesome milk coming from Illinois; (2) this imposes a discriminatory burden on interstate commerce; (3) such a burden cannot be imposed where, as here, there are reasonable, nondiscriminatory and adequate alternatives available. I disagree with the Court's premises, reasoning, and judgment.

(1) This ordinance does not exclude wholesome milk coming from Illinois or anywhere else. It does require that all milk sold in Madison must be pasteurized within five miles of the center of the city. But there was no finding in the state courts, nor evidence to justify a finding there or here, that appellant, Dean Milk Company, is unable to have its milk pasteurized within the defined geographical area. As a practical matter, so far as the record shows, Dean can easily comply with the ordinance whenever it wants to. Therefore, Dean's personal preference to pasteurize in Illinois, not the ordinance, keeps Dean's milk out of Madison.

(2) Characterization of § 7.21 as a "discriminatory burden" on interstate commerce is merely a statement of the Court's result, which I think incorrect. The section does prohibit the sale of milk in Madison by interstate and intrastate producers who prefer to pasteurize over five miles distant from the city. But both state courts below found that § 7.21 represents a good-faith attempt to safeguard public health by making adequate sanitation

inspections possible. While we are not bound by these findings, I do not understand the Court to overturn them. Therefore, the fact that § 7.21, like all health regulations, imposes some burden on trade, does not mean that it "discriminates" against interstate commerce.

(3) This health regulation should not be invalidated merely because the Court believes that alternative milk-inspection methods might insure the cleanliness and healthfulness of Dean's Illinois milk. I find it difficult to explain why the Court uses the "reasonable alternative" concept to protect trade when today it refuses to apply the same principle to protect freedom of speech. *Feiner* v. *New York,* 340 U. S. 315. For while the "reasonable alternative" concept has been invoked to protect First Amendment rights, *e. g., Schneider* v. *State,* 308 U. S. 147, 162, it has not heretofore been considered an appropriate weapon for striking down local health laws. Since the days of Chief Justice Marshall, federal courts have left states and municipalities free to pass bona fide health regulations subject only "to the paramount authority of Congress if it decides to assume control . . . ." *The Minnesota Rate Cases,* 230 U. S. 352, 406; *Gibbons* v. *Ogden,* 9 Wheat. 1, 203, 204; *Mintz* v. *Baldwin,* 289 U. S. 346, 349–350; and see *Baldwin* v. *Seelig,* 294 U. S. 511, 524. This established judicial policy of refusing to invalidate genuine local health laws under the Commerce Clause has been approvingly noted even in our recent opinions measuring state regulation by stringent standards. See, *e. g., Hood & Sons* v. *Du Mond,* 336 U. S. 525, 531–532. No case is cited, and I have found none, in which a bona fide health law was struck down on the ground that some other method of safeguarding health would be as good as, or better than, the one the Court was called on to review. In my view, to use this ground now elevates the right to traffic in commerce for profit above

the power of the people to guard the purity of their daily diet of milk.

If, however, the principle announced today is to be followed, the Court should not strike down local health regulations unless satisfied beyond a reasonable doubt that the substitutes it proposes would not lower health standards. I do not think that the Court can so satisfy itself on the basis of its judicial knowledge. And the evidence in the record leads me to the conclusion that the substitute health measures suggested by the Court ·do not insure milk as safe as the Madison ordinance requires.

One of the Court's proposals is that Madison require milk processors to pay reasonable inspection fees at the milk supply "sources." Experience shows, however, that the fee method gives rise to prolonged litigation over the calculation and collection of the charges. *E. g.,* *Sprout* v. *South Bend,* 277 U. S. 163; *Capitol Greyhound Lines* v. *Brice,* 339 U. S. 542. To throw local milk regulation into such a quagmire of uncertainty jeopardizes the admirable milk-inspection systems in force in many municipalities. Moreover, nothing in the record before us indicates that the fee system might not be as costly to Dean as having its milk pasteurized in Madison. Surely the Court is not resolving this question by drawing on its "judicial knowledge" to supply information as to comparative costs, convenience, or effectiveness.

The Court's second proposal is that Madison adopt § 11 of the "Model Milk Ordinance." The state courts made no findings as to the relative merits of this inspection ordinance and the one chosen by Madison. The evidence indicates to me that enforcement of the Madison law would assure a more healthful quality of milk than that which is entitled to use the label of "Grade·A" under the Model Ordinance. Indeed, the United States Board of Public Health, which drafted the Model Ordinance, sug-

gests that the provisions are "minimum" standards only. The Model Ordinance does not provide for continuous investigation of all pasteurization plants as does § 7.21 of the Madison ordinance. Under § 11, moreover, Madison would be required to depend on the Chicago inspection system since Dean's plants, and the farms supplying them with raw milk, are located in the Chicago milkshed. But there is direct and positive evidence in the record that milk produced under Chicago standards did not meet the Madison requirements.

Furthermore, the Model Ordinance would force the Madison health authorities to rely on "spot checks" by the United States Public Health Service to determine whether Chicago enforced its milk regulations. The evidence shows that these "spot checks" are based on random inspection of farms and pasteurization plants: the United States Public Health Service rates the ten thousand or more dairy farms in the Chicago milkshed by a sampling of no more than two hundred farms. The same sampling technique is employed to inspect pasteurization plants. There was evidence that neither the farms supplying Dean with milk nor Dean's pasteurization plants were necessarily inspected in the last "spot check" of the Chicago milkshed made two years before the present case was tried.

From what this record shows, and from what it fails to show, I do not think that either of the alternatives suggested by the Court would assure the people of Madison as pure a supply of milk as they receive under their own ordinance. On this record I would uphold the Madison law. At the very least, however, I would not invalidate it without giving the parties a chance to present evidence and get findings on the ultimate issues the Court thinks crucial—namely, the relative merits of the Madison ordinance and the alternatives suggested by the Court today.